1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   IAN V. YANNIELLO (Cal. Bar No. 265481)
4  Assistant United States Attorney
   Chief, General Crimes Section
5  HAOXIAOHAN CAI (Cal. Bar No. 331131)
   Assistant United States Attorney
6  Major Frauds Section
   1200/1100 United States Courthouse
7  312 North Spring Street
   Los Angeles, California 90012
8  Telephone:    (213) 894-3667/0762
   Facsimile:    (213) 894-0141
9  E-mail:   Ian.Yanniello@usdoj.gov
             Haoxiaohan.Cai@usdoj.gov
10
   Attorneys for Plaintiff
11 UNITED STATES OF AMERICA



FILED
CLERK, U.S. DISTRICT COURT

8/15/2024

CENTRAL DISTRICT OF CALIFORNIA
BY:_____MMC_____DEPUTY

12                UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,      No. CR  2:24-CR-00492-MWF

15          Plaintiff,            PLEA AGREEMENT FOR DEFENDANT
                                  MARK CHAVEZ
16          v.

17 MARK CHAVEZ,

18          Defendant.

19

20      1.   This constitutes the plea agreement between MARK CHAVEZ

21 ("defendant") and the United States Attorney's Office for the Central

22 District of California ("the USAO") related to the investigation of

23 the drug overdose death of Victim M.P.  This agreement is limited to

24 the USAO and cannot bind any other federal, state, local, or foreign

25 prosecuting, enforcement, administrative, or regulatory authorities.

26                  DEFENDANT'S OBLIGATIONS

27      2.   Defendant agrees to:

28

a.    Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to an information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with conspiracy to distribute ketamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(E)(i).

b.    Not contest facts agreed to in this agreement.

c.    Abide by all agreements regarding sentencing contained in this agreement.

d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.    Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.    Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.    Defendant understands that the government obtained additional material in this investigation that defendant has not been shown.  In exchange for the government's obligations under this agreement, defendant gives up any right he may have had to review the additional material, regardless of whether it is arguably exculpatory or inculpatory, and further agrees to waive any argument that the withholding of this material caused defendant's plea to be not

knowing or involuntary.  The government agrees not to use at
sentencing any of the withheld material without providing it to
defendant.

     3.    Defendant further agrees to cooperate fully with the USAO,
the Drug Enforcement Administration, the United States Postal
Inspection Service, the Los Angeles Police Department, and, as
directed by the USAO, any other federal, state, local, or foreign
prosecuting, enforcement, administrative, or regulatory authority.
This cooperation requires defendant to:

          a.    Respond truthfully and completely to all questions
that may be put to defendant, whether in interviews, before a grand
jury, or at any trial or other court proceeding.

          b.    Attend all meetings, grand jury sessions, trials or
other proceedings at which defendant's presence is requested by the
USAO or compelled by subpoena or court order.

          c.    Produce voluntarily all documents, records, or other
tangible evidence relating to matters about which the USAO, or its
designee, inquires.

     4.    For purposes of this agreement: (1) "Cooperation
Information" shall mean any statements made, or documents, records,
tangible evidence, or other information provided, by defendant
pursuant to defendant's cooperation under this agreement or pursuant
to the letter agreement previously entered into by the parties dated
April 4, 2024 (the "Letter Agreement"); and (2) "Plea Information"
shall mean any statements made by defendant, under oath, at the
guilty plea hearing and the agreed to factual basis statement in this
agreement.

3

THE USAO'S OBLIGATIONS

5.    The USAO agrees to:

    a.    Not contest facts agreed to in this agreement.

    b.    Abide by all agreements regarding sentencing contained in this agreement.

    c.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

6.    The USAO further agrees:

    a.    Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

    b.    Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline

range, including the appropriateness of an upward departure, or the
sentence to be imposed, and to recommend to the Court that
Cooperation Information not be used in determining the applicable
guideline range or the sentence to be imposed.  Defendant
understands, however, that Cooperation Information will be disclosed
to the United States Probation and Pretrial Services Office and the
Court, and that the Court may use Cooperation Information for the
purposes set forth in U.S.S.G § 1B1.8(b) and for determining the
sentence to be imposed.

     c.   In connection with defendant's sentencing, to bring to
the Court's attention the nature and extent of defendant's
cooperation.

     d.   If the USAO determines, in its exclusive judgment,
that defendant has both complied with defendant's obligations under
paragraphs 2 and 3 above and provided substantial assistance to law
enforcement in the prosecution or investigation of another
("substantial assistance"), to move the Court pursuant to U.S.S.G.
§ 5K1.1 to fix an offense level and corresponding guideline range
below that otherwise dictated by the sentencing guidelines, and to
recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

    7.   Defendant understands the following:

     a.   Any knowingly false or misleading statement by
defendant will subject defendant to prosecution for false statement,
obstruction of justice, and perjury and will constitute a breach by
defendant of this agreement.

     b.   Nothing in this agreement requires the USAO or any
other prosecuting, enforcement, administrative, or regulatory

1  authority to accept any cooperation or assistance that defendant may

2  offer, or to use it in any particular way.

3          c.    Defendant cannot withdraw defendant's guilty plea if

4  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a

5  reduced guideline range or if the USAO makes such a motion and the

6  Court does not grant it or if the Court grants such a USAO motion but

7  elects to sentence above the reduced range.

8          d.    At this time the USAO makes no agreement or

9  representation as to whether any cooperation that defendant has

10  provided or intends to provide constitutes or will constitute

11  substantial assistance.  The decision whether defendant has provided

12  substantial assistance will rest solely within the exclusive judgment

13  of the USAO.

14          e.    The USAO's determination whether defendant has

15  provided substantial assistance will not depend in any way on whether

16  the government prevails at any trial or court hearing in which

17  defendant testifies or in which the government otherwise presents

18  information resulting from defendant's cooperation.

19                          NATURE OF THE OFFENSES

20      8.    Defendant understands that for defendant to be guilty of

21  the crime charged in the information, that is, conspiracy to

22  distribute ketamine, in violation of Title 21, United States Code,

23  Section 846, the following must be true: (1) there was an agreement

24  between two or more persons to commit the crime of distribution of

25  ketamine, in violation 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i); and (2)

26  defendant joined in that agreement knowing of its purpose and

27  intending to help accomplish that purpose.  Defendant understands

28  that the crime of distribution of ketamine, in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(E)(i), the object of the conspiracy, has four elements: (1) defendant knowingly distributed ketamine; (2) defendant knew that it was ketamine or some other federally controlled substance; (3) defendant acted outside the scope of professional practice; and (4) defendant acted without a legitimate medical purpose.

## PENALTIES

9.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 21, United States Code, Sections 846, and 841(a)(1), (b)(1)(E)(i), is: 10 years imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.   Defendant understands that under 21 U.S.C. § 862a, defendant will not be eligible for assistance under state programs funded under the Social Security Act or Federal Food Stamp Act or for federal food stamp program benefits, and that any such benefits or assistance received by defendant's family members will be reduced to reflect defendant's ineligibility.

11.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could

result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

12. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

13. Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States. Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case. Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his conviction on his immigration

status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

14.  Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 16 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

**Defendant Was a Medical Doctor Who Knew About the Risks of Administering Ketamine Without Appropriate Medical Supervision**

At all relevant times to this factual basis, defendant CHAVEZ and Co-Conspirator Salvador PLASENCIA ("Co-Conspirator PLASENCIA") were medical doctors licensed to practice in the State of California. Defendant CHAVEZ and Co-Conspirator PLASENCIA had also applied for and obtained authorization from the Drug Enforcement Administration ("DEA") to dispense, administer, and prescribe narcotics and other controlled substances, so long as such prescriptions were for a legitimate medical purpose.

At all relevant times, defendant CHAVEZ knew that ketamine was a Schedule III controlled substance that was FDA-approved for induction and maintenance of general anesthesia during surgical procedures. Defendant CHAVEZ understood that ketamine should be administered only under close supervision of a medical doctor and/or professional

1  health care provider because of risks associated with ketamine,

2  including sedation, dissociation, psychiatric events, abuse and

3  misuse, sudden increases in blood pressure, and respiratory

4  depression, among others. Based on these risks, defendant CHAVEZ

5  believed it was necessary for a health care provider to closely

6  monitor a patient who had just been administered liquid ketamine.

7  Additionally, defendant CHAVEZ understood that during such monitoring

8  period, the medical provider should have access to certain life-

9  saving equipment, including a defibrillator, a supply of supplemental

10 oxygen, equipment to monitor the patient's heart rate and breathing,

11 and medication to ensure patient safety, including medication to

12 control unsafe spikes in blood pressure.  Defendant CHAVEZ also

13 understood that it was especially important to monitor patients who

14 received ketamine via intramuscular injection ("IM"), because the

15 ketamine would not enter the blood stream immediately, and could

16 result in "stacking" of the drug's effects.

17      At all relevant times, defendant was fully aware that selling

18 vials of ketamine to a patient for self-administration was illegal,

19 far outside the scope of professional practice, and without a

20 legitimate medical purpose.  Defendant CHAVEZ similarly knew it was

21 illegal to obtain a prescription of a controlled substance in the

22 name of a patient without the patient's knowledge or consent.

23            **Defendant and Co-Conspirator PLASENCIA Conspire to Distribute**

24                      **Ketamine to Victim M.P.**

25      Beginning on an unknown date but no later than in or around

26 September 2023, and continuing until approximately October 28, 2023,

27 in Los Angeles County, within the Central District of California, and

28 elsewhere, defendant conspired with others known and unknown,

1  including Co-Conspirator PLASENCIA, to knowingly and intentionally
2  distribute ketamine, a schedule III federally controlled substance,
3  in a manner outside the scope of medical practice and without a
4  legitimate medical purpose.  Defendant joined the agreement knowing
5  of its purpose and intending to help accomplish its purpose.

6      The conspiracy began on or about September 30, 2023.  On that
7  day, Co-Conspirator PLASENCIA called defendant CHAVEZ to ask about
8  obtaining ketamine for someone who Co-Conspirator PLASENCIA
9  identified as a "patient."  During the phone call or soon after, Co-
10 Conspirator PLASENCIA identified the patient as a well-known actor
11 (hereafter "Victim M.P.") who was willing to pay a premium to acquire
12 ketamine. At the time of the September 30 phone call, defendant
13 CHAVEZ had known Co-Conspirator PLASENCIA for at least twenty years,
14 and knew that Co-Conspirator PLASENCIA had little, if any, experience
15 treating patients with ketamine.  Defendant CHAVEZ confirmed he had
16 vials of ketamine and stated he was willing to transfer the ketamine
17 to Co-Conspirator PLASENCIA in exchange for money.

18     After the call, in a text message, defendant CHAVEZ told Co-
19 Conspirator PLASENCIA that he also had "Ketamine lozenges," referring
20 to a compounded drug that could be orally administered.  The ketamine
21 lozenges that defendant CHAVEZ offered to Co-Conspirator PLASENCIA
22 and, as described below, later transferred to Co-Conspirator
23 PLASENCIA, were fraudulently obtained.  Specifically, on July 17,
24 2023, defendant CHAVEZ submitted a fraudulent prescription to
25 Pharmacy 1 to obtain thirty 200mg ketamine lozenges in the name of
26 Patient V.B. without Patient V.B.'s knowledge or consent.  Pharmacy 1
27 subsequently filled the fraudulent prescription and sent defendant
28 CHAVEZ ten 200mg ketamine lozenges for V.B. (the "Fraudulent V.B.

Prescription"). On September 30, 2023, defendant CHAVEZ sent Co-Conspirator PLASENCIA a photograph of the Fraudulent V.B. Prescription that had V.B.'s name redacted with black marker, and indicated he was willing to transfer the lozenges in addition to liquid ketamine to Co-Conspirator PLASENCIA.

On September 30, 2023, after discussing the ketamine that defendant CHAVEZ had available, the co-conspirators agreed to meet and discussed how much to charge Victim M.P. for the ketamine. During this discussion, Co-Conspirator PLASENCIA stated, "If i can get you 2k would you meet me half way?" Defendant CHAVEZ responded "yes."

Later that day, defendant CHAVEZ and Co-Conspirator PLASENCIA met in or around Costa Mesa, California, within the Central District of California. During that meeting, defendant CHAVEZ transferred the following to Co-Conspirator PLASENCIA knowing that Co-Conspirator PLASENCIA would sell the ketamine to Victim M.P.: at least four vials of liquid ketamine, ketamine lozenges from the Fraudulent V.B. Prescription, gloves, and syringes.

That same day, Co-Conspirator PLASENCIA traveled to the residence of Victim M.P. and injected Victim M.P. with ketamine, and left behind at least one vial of ketamine for Victim M.P.'s use. After Co-Conspirator PLASENCIA transferred ketamine to Victim M.P., defendant CHAVEZ and Co-Conspirator PLASENCIA exchanged text messages about the meeting, including Co-Conspirator PLASENCIA stating the meeting with Victim M.P. was "like a bad movie." Co-Conspirator PLASENCIA subsequently paid defendant CHAVEZ a portion of the money he received for selling the ketamine to Victim M.P.

Between October 1 and October 2, 2023, defendant CHAVEZ and Co-Conspirator PLASENCIA discussed obtaining more ketamine for Victim

M.P. Questions asked by Co-Conspirator PLASENCIA during these
conversations confirmed to defendant CHAVEZ that Co-Conspirator
PLASENCIA was unfamiliar with how to diagnose patients for proper
ketamine use, the proper procedures for administering ketamine, and
monitoring patients in the aftermath of ketamine administration.
During this timeframe, Co-Conspirator PLASENCIA told defendant CHAVEZ
that Victim M.P. had requested the ketamine to help Victim M.P. quit
smoking, which, at all relevant times, defendant CHAVEZ knew was not
a legitimate medical use for ketamine.

On October 2, 2023, ahead of a planned meeting with Victim M.P.,
Co-Conspirator PLASENCIA stated "[i]f today goes well we may have
repeat business," to which defendant CHAVEZ replied: "Let's do
everything we can to make it happen."  Co-Conspirator PLASENCIA also
told defendant CHAVEZ that he needed additional liquid ketamine to
transfer to Victim M.P.  Among other things, defendant CHAVEZ told
Co-Conspirator PLASENCIA "[y]ou should sell him the troches,"
referring to the ketamine lozenges from the Fraudulent V.B.
Prescription. That same day, Co-Conspirator PLASENCIA updated
defendant CHAVEZ on his interactions with Victim M.P., advising that
he had given Victim M.P. three injections of ketamine totaling 260
milligrams and was about to administer another 100-milligram shot.
Defendant CHAVEZ understood administering 360 milligrams of ketamine
within an hour could potentially be a dangerous amount of ketamine,
depending on the patient's underlying health conditions.

Later that same day, October 2, 2023, in furtherance of his
agreement to sell more ketamine to Co-Conspirator PLASENCIA,
defendant CHAVEZ contacted at least two medical distributors to
inquire about obtaining ketamine.  Specifically, defendant CHAVEZ

1  attempted to place an order for vials of ketamine from Wholesale
2  Ketamine Distributor 1.  Defendant CHAVEZ also contacted Wholesale
3  Ketamine Distributor 2 and submitted a License Authorization Form for
4  the purpose of obtaining additional ketamine to transfer to Co-
5  Conspirator PLASENCIA.  Among other things, the License Authorization
6  Form that defendant CHAVEZ submitted under penalty of perjury
7  contained false statements, including that defendant worked for the
8  facility "Dreamscape Ketamine – The Health MD" and a certification
9  that the ketamine "will be used only by the organization" and "will
10 not be sold to a third party, distributed or used for any other
11 purpose."  As defendant CHAVEZ then knew, he had separated from
12 Dreamscape Ketamine no later than July 2023 and any ketamine he
13 ordered would not be used by Dreamscape Ketamine.

14      On or about October 4, 2023, defendant CHAVEZ agreed to provide
15 Co-Conspirator PLASENCIA eight additional vials of liquid ketamine so
16 Co-Conspirator PLASENCIA could sell the ketamine to Victim M.P. On
17 October 4, the co-conspirators met in Irvine, California, where
18 defendant CHAVEZ transferred eight ketamine vials to Co-Conspirator
19 PLASENCIA knowing the ketamine would be transferred to Victim M.P.
20 Co-Conspirator PLASENCIA subsequently paid defendant CHAVEZ for the
21 ketamine.

22      Due to the amount of ketamine Victim M.P. requested, Co-
23 Conspirator PLASENCIA asked defendant CHAVEZ about obtaining more
24 ketamine on October 4, 2023, stating: "any trouble finding more
25 ketamine...in case this continues with this guy" and "I think it
26 would be best served not having him look elsewhere and [b]e his go
27 to."  Defendant CHAVEZ confirmed he was "working on getting more"
28 ketamine.  On that same day, defendant CHAVEZ contacted Wholesale

1    Ketamine Distributors 1 and 2 about obtaining additional ketamine to
2    transfer to Co-Conspirator PLASENCIA.  Specifically, defendant CHAVEZ
3    submitted an order for 10 vials of ketamine to Wholesale Ketamine
4    Distributor 2.  Defendant CHAVEZ received an email from Wholesale
5    Ketamine Distributor 1 about his October 2 ketamine order, stating
6    that they had put the order on hold and requested that defendant
7    CHAVEZ complete certain forms, including a "Know Your Customer" DEA
8    Questionnaire.  Defendant CHAVEZ completed the questionnaire on
9    October 4, 2023, and signed his name, declaring under penalty of
10   perjury that the information on the questionnaire was true and
11   correct.  Defendant CHAVEZ then submitted the DEA Questionnaire to
12   Wholesale Ketamine Distributor 1 knowing that it contained materially
13   false statements, including claims that "Patients are vetted very
14   carefully.  Prescr[i]ptions for controlled substances are only
15   prescribed after determining there is genuine need" and responding
16   "No" in response to the question, "Do you sell any products to other
17   []practitioners?"

18        On October 5, 2023, after Wholesale Ketamine Distributor 1
19   received defendant CHAVEZ's signed DEA Questionnaire, it processed
20   his order for 10 vials of ketamine, for which defendant CHAVEZ paid
21   $121.41.  On October 6, 2023, defendant CHAVEZ advised Co-Conspirator
22   PLASENCIA that he had "found a pharmacy that has Ketamine," and that
23   they could have a supply sooner than expected.  On October 9, 2023,
24   defendant CHAVEZ received the ketamine shipment from Wholesale
25   Ketamine Distributor 1 and sent the following text message to Co-
26   Conspirator PLASENCIA: "Are we still meeting tomorrow. We got the
27   Shipment today. One box of 10 vials."  Co-Conspirator PLASENCIA
28   responded, "Great. Yes. I'm going to probably come to you[] mid day."

On or before October 9, 2023, defendant CHAVEZ was aware that Co-Conspirator PLASENCIA had been providing Victim M.P. with defendant CHAVEZ's ketamine in a medically unsafe manner.  Defendant CHAVEZ knew that Co-Conspirator PLASENCIA was leaving ketamine vials with Victim M.P. and Victim M.P.'s personal assistant for self-administration, which defendant CHAVEZ knew was outside the scope of professional practice and without any legitimate medical purpose. Moreover, defendant CHAVEZ understood based on information provided by Co-Conspirator PLASENCIA that Victim M.P. had health issues that could increase the risk of taking ketamine outside of a clinical setting and without proper medical observation.

On October 10, 2023, defendant CHAVEZ and Co-Conspirator PLASENCIA met in Irvine, California, and defendant CHAVEZ transferred 10 ketamine vials to Co-Conspirator PLASENCIA so that Co-Conspirator PLASENCIA could sell them to Victim M.P.  That same day, defendant CHAVEZ learned from Co-Conspirator PLASENCIA that Co-Conspirator PLASENCIA had injected Victim M.P. with ketamine while Victim M.P. was sitting in the back of a car that was parked in a public parking lot near an aquarium in Long Beach, California.  Defendant CHAVEZ had a phone call with Co-Conspirator PLASENCIA where defendant CHAVEZ reprimanded Co-Conspirator PLASENCIA for "dosing people" in cars, in a public place where children are present.

On or about October 12, 2023, Co-Conspirator PLASENCIA injected Victim M.P. with a large dose of ketamine at Victim M.P.'s residence, resulting in Victim M.P. having a serious adverse reaction, including a significant spike in Victim M.P.'s blood pressure.  Co-Conspirator PLASENCIA subsequently discussed Victim M.P.'s reaction to the ketamine with defendant CHAVEZ.

On or about October 12, 2023, defendant CHAVEZ learned that the Medical Board of California was investigating an allegation that defendant CHAVEZ had improperly taken ketamine from his former ketamine clinic, Dreamscape Ketamine.  After learning about the investigation, defendant CHAVEZ informed Co-Conspirator PLASENCIA about the investigation and informed Co-Conspirator PLASENCIA that he would not be able to continue to obtain additional ketamine to sell to Co-Conspirator PLASENCIA.

On October 13, 2023, Co-Conspirator PLASENCIA asked defendant CHAVEZ if he was interested in running the ketamine division of a clinic that defendant PLASENCIA wanted to set up.  Defendant CHAVEZ said that the idea was "interesting," and that "as long as we are doing things on the up and up we can start ASAP."  When Co-Conspirator PLASENCIA asked what he meant, defendant CHAVEZ clarified: "All done legally without any shady stuff.  Having them come to the clinic will ensure this."  When Co-Conspirator PLASENCIA asked, "Oh so you dont agree with the method i am currently doing?" defendant CHAVEZ said: "It's not what I think it's what an entity like the California medical board would view it . . . or the DEA."  Co-Conspirator PLASENCIA then asked, "So you think I should stop the current arrangement I have?" And defendant CHAVEZ responded: "Depends on your tolerance for risk."  Defendant CHAVEZ thereafter forwarded Co-Conspirator PLASENCIA a screenshot of an email from an investigator with the California Board of Medicine regarding the pending complaint and investigation into defendant CHAVEZ.

In total, defendant CHAVEZ transferred at least 22 5ml (100mg/ml) vials of ketamine, and 9 ketamine lozenges to Co-

Conspirator PLASENCIA, all of which defendant CHAVEZ understood would be used by Victim M.P.

On or about October 28, 2023, Victim M.P. was found dead inside of a jacuzzi at Victim M.P.'s Los Angeles residence. After learning about Victim M.P.'s death, defendant CHAVEZ called Co-Conspirator PLASENCIA to discuss whether Co-Conspirator PLASENCIA was concerned about Victim M.P.'s death. Co-Conspirator PLASENCIA indicated that he was not worried because he had not seen Victim M.P. for a couple of weeks.

**Defendant Took Steps to Conceal the Transfer of Ketamine to Co-Conspirator PLASENCIA**

Until in or around July 2023, defendant CHAVEZ was affiliated with a ketamine infusion clinic called Dreamscape Ketamine, located in San Diego, California. In July 2023, defendant CHAVEZ and his business partner had a dispute and decided that defendant CHAVEZ would no longer be affiliated with Dreamscape Ketamine. Because defendant CHAVEZ's business partner was not a medical doctor, defendant CHAVEZ subsequently retrieved all prescription drugs --- including ketamine --- from the clinic, including the Fraudulent V.B. Prescription. On September 13, 2023, defendant CHAVEZ lawfully transferred some of the ketamine he seized from the clinic to a medical facility located in San Diego (the "Medical Facility"). Defendant CHAVEZ, however, kept possession of at least the following: (1) the ketamine lozenges prescribed to V.B. from the Fraudulent V.B. Prescription, and (2) at least 12 vials of ketamine that defendant CHAVEZ subsequently transferred to Co-Conspirator PLASENCIA in September and October 2023.

On October 19, 2023, DEA diversion investigators and an investigator with the Medical Board of California interviewed defendant CHAVEZ. During the interview, investigators asked defendant CHAVEZ if he still possessed the ketamine that was taken from the clinic. Defendant CHAVEZ responded no, stating that he had transferred the liquid ketamine to the Medical Facility. Investigators also asked defendant CHAVEZ about the ketamine lozenges prescribed to Patient V.B. Defendant CHAVEZ admitted he prescribed the lozenges without Patient V.B.'s knowledge or consent, but claimed he had thrown the prescription away because the lozenges melted inside of his vehicle. At all relevant times during the interview, defendant CHAVEZ concealed from investigators that he had, in fact, transferred ketamine to Co-Conspirator PLASENCIA, including the Fraudulent V.B. Prescription. During the interview, defendant CHAVEZ also concealed material evidence from investigators, including text messages and "Bill of Sale" documents showing ketamine transfers to Co-Conspirator PLASENCIA.

## SENTENCING FACTORS

15. Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds

appropriate up to the maximum set by statute for the crimes of conviction.

16.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. §§ 2D1.1(a)(5) & (c)(17)] |
| Abuse of Position of Trust or Use of Special Skill | +2 | [U.S.S.G. § 3B1.3] |
| Obstruction of Justice | +2 | [U.S.S.G. § 3C1.1] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

17.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

                    WAIVER OF CONSTITUTIONAL RIGHTS

18.  Defendant understands that by pleading guilty, defendant gives up the following rights:

          a.    The right to persist in a plea of not guilty.

          b.    The right to a speedy and public trial by jury.

          c.    The right to be represented by counsel — and if necessary have the Court appoint counsel — at trial.  Defendant understands, however, that, defendant retains the right to be

1    represented by counsel – and if necessary have the Court appoint

2    counsel – at every other stage of the proceeding.

3          d.    The right to be presumed innocent and to have the

4    burden of proof placed on the government to prove defendant guilty

5    beyond a reasonable doubt.

6          e.    The right to confront and cross-examine witnesses

7    against defendant.

8          f.    The right to testify and to present evidence in

9    opposition to the charges, including the right to compel the

10   attendance of witnesses to testify.

11         g.    The right not to be compelled to testify, and, if

12   defendant chose not to testify or present evidence, to have that

13   choice not be used against defendant.

14         h.    Any and all rights to pursue any affirmative defenses,

15   Fourth Amendment or Fifth Amendment claims, and other pretrial

16   motions that have been filed or could be filed.

17   <u>WAIVER OF APPEAL OF CONVICTION</u>

18       19.    Defendant understands that, with the exception of an appeal

19   based on a claim that defendant's guilty plea was involuntary, by

20   pleading guilty defendant is waiving and giving up any right to

21   appeal defendant's conviction on the offense to which defendant is

22   pleading guilty.  Defendant understands that this waiver includes,

23   but is not limited to, arguments that the statutes to which defendant

24   is pleading guilty are unconstitutional, and any and all claims that

25   the statement of facts provided herein is insufficient to support

26   defendant's plea of guilty.

27

28

1    <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK</u>

2         20.   Defendant agrees that, provided the Court imposes a total

3    term of imprisonment within or below the range corresponding to an

4    offense level of 10 and the criminal history category calculated by

5    the Court, defendant gives up the right to appeal all of the

6    following: (a) the procedures and calculations used to determine and

7    impose any portion of the sentence; (b) the term of imprisonment

8    imposed by the Court; (c) the fine imposed by the Court, provided it

9    is within the statutory maximum; (d) to the extent permitted by law,

10   the constitutionality or legality of defendant's sentence, provided

11   it is within the statutory maximum; (e) the term of probation or

12   supervised release imposed by the Court, provided it is within the

13   statutory maximum; and (f) any of the following conditions of

14   probation or supervised release imposed by the Court: the conditions

15   set forth in Second Amended General Order 20-04 of this Court; the

16   drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and

17   3583(d); and the alcohol and drug use conditions authorized by 18

18   U.S.C. § 3563(b)(7).

19        21.   Defendant also gives up any right to bring a post-

20   conviction collateral attack on the conviction or sentence, except a

21   post-conviction collateral attack based on a claim of ineffective

22   assistance of counsel, a claim of newly discovered evidence, or an

23   explicitly retroactive change in the applicable Sentencing

24   Guidelines, sentencing statutes, or statutes of conviction.

25   Defendant understands that this waiver includes, but is not limited

26   to, arguments that the statute to which defendant is pleading guilty

27   is unconstitutional, and any and all claims that the statement of

28

facts provided herein is insufficient to support defendant's plea of
guilty.

22.   The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum specified above and
(b) the Court imposes a term of imprisonment within or above the
range corresponding to an offense level of 10 and the criminal
history calculated by the Court, the USAO gives up its right to
appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

23.   Defendant agrees that if, after entering a guilty plea
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty plea on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement, including in particular its
obligations regarding the use of Cooperation Information; (b) in any
investigation, criminal prosecution, or civil, administrative, or
regulatory action, defendant agrees that any Cooperation Information
and any evidence derived from any Cooperation Information shall be
admissible against defendant, and defendant will not assert, and
hereby waives and gives up, any claim under the United States
Constitution, any statute, or any federal rule, that any Cooperation
Information or any evidence derived from any Cooperation Information
should be suppressed or is inadmissible; and (c) should the USAO
choose to pursue any charge that was either dismissed or not filed as
a result of this agreement, then (i) any applicable statute of
limitations will be tolled between the date of defendant's signing of
this agreement and the filing commencing any such action; and

(ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

### EFFECTIVE DATE OF AGREEMENT

24. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

### BREACH OF AGREEMENT

25. Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

    a. If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.    The USAO will be relieved of all its obligations under
this agreement; in particular, the USAO: (i) will no longer be bound
by any agreements concerning sentencing and will be free to seek any
sentence up to the statutory maximum for the crimes to which
defendant has pleaded guilty; (ii) will no longer be bound by any
agreements regarding criminal prosecution, and will be free to
criminally prosecute defendant for any crime; and (iii) will no
longer be bound by any agreement regarding the use of Cooperation
Information and will be free to use any Cooperation Information in
any way in any investigation, criminal prosecution, or civil,
administrative, or regulatory action.

c.    The USAO will be free to criminally prosecute
defendant for false statement, obstruction of justice, and perjury
based on any knowingly false or misleading statement by defendant.

d.    In any investigation, criminal prosecution, or civil,
administrative, or regulatory action: (i) defendant will not assert,
and hereby waives and gives up, any claim that any Cooperation
Information was obtained in violation of the Fifth Amendment
privilege against compelled self-incrimination; and (ii) defendant
agrees that any Cooperation Information and any Plea Information, as
well as any evidence derived from any Cooperation Information or any
Plea Information, shall be admissible against defendant, and
defendant will not assert, and hereby waives and gives up, any claim
under the United States Constitution, any statute, Rule 410 of the
Federal Rules of Evidence, Rule 11(f) of the Federal Rules of
Criminal Procedure, or any other federal rule, that any Cooperation
Information, any Plea Information, or any evidence derived from any

Cooperation Information or any Plea Information should be suppressed
or is inadmissible.

### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
### OFFICE NOT PARTIES

26. Defendant understands that the Court and the United States
Probation and Pretrial Services Office are not parties to this
agreement and need not accept any of the USAO's sentencing
recommendations or the parties' agreements to facts or sentencing
factors.

27. Defendant understands that both defendant and the USAO are
free to: (a) supplement the facts by supplying relevant information
to the United States Probation and Pretrial Services Office and the
Court, (b) correct any and all factual misstatements relating to the
Court's Sentencing Guidelines calculations and determination of
sentence, and (c) argue on appeal and collateral review that the
Court's Sentencing Guidelines calculations and the sentence it
chooses to impose are not error, although each party agrees to
maintain its view that the calculations in paragraph 16 are
consistent with the facts of this case.  While this paragraph permits
both the USAO and defendant to submit full and complete factual
information to the United States Probation and Pretrial Services
Office and the Court, even if that factual information may be viewed
as inconsistent with the facts agreed to in this agreement, this
paragraph does not affect defendant's and the USAO's obligations not
to contest the facts agreed to in this agreement.

28. Defendant understands that even if the Court ignores any
sentencing recommendation, finds facts or reaches conclusions
different from those agreed to, and/or imposes any sentence up to the

1    maximum established by statute, defendant cannot, for that reason,

2    withdraw defendant's guilty plea, and defendant will remain bound to

3    fulfill all defendant's obligations under this agreement.  Defendant

4    understands that no one -- not the prosecutor, defendant's attorney,

5    or the Court -- can make a binding prediction or promise regarding

6    the sentence defendant will receive, except that it will be within

7    the statutory maximum.

8                        NO ADDITIONAL AGREEMENTS

9         29.  Defendant understands that, except as set forth herein,

10    there are no promises, understandings, or agreements between the USAO

11    and defendant or defendant's attorney, and that no additional

12    promise, understanding, or agreement may be entered into unless in a

13    writing signed by all parties or on the record in court.

14    //

15    //

16    //

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

30.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

E. MARTIN ESTRADA
United States Attorney

_Ian V. Yanniello_                              **7/24/2024**
IAN V. YANNIELLO                                Date
HAOXIAOHAN CAI
Assistant United States Attorneys

_Mark Chavez_                                   **7/22/24**
MARK CHAVEZ                                     Date
Defendant

_Matt B_                                        **7/22/24**
MATTHEW C. BINNINGER                            Date
Attorney for Defendant MARK CHAVEZ

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or

28

representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

MARK CHAVEZ
Defendant

7/22/24
Date

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am MARK CHAVEZ's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this

1  agreement is an informed and voluntary one; and the factual basis set

2  forth in this agreement is sufficient to support my client's entry of

3  a guilty plea pursuant to this agreement.

4

5  MATTHEW C. BINNINGER                          7 / 22 / 24
   Attorney for Defendant MARK CHAVEZ           Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. |
| Plaintiff, | I N F O R M A T I O N |
| v. | [21 U.S.C. § 846: Conspiracy to Distribute Ketamine] |
| MARK CHAVEZ, | |
| Defendant. | |

The United States Attorney charges:

[21 U.S.C. § 846]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1.   Defendant MARK CHAVEZ was a medical doctor licensed to practice in the State of California.  Defendant CHAVEZ had applied for and obtained authorization from the Drug Enforcement Administration ("DEA") to dispense, administer, and prescribe narcotics and other controlled substances, so long as such prescriptions were for a legitimate medical purpose.

2.   Defendant CHAVEZ knew that ketamine was a Schedule III controlled substance that was FDA-approved for induction and maintenance of general anesthesia during surgical procedures.  Due to

medical risks associated with ketamine, defendant CHAVEZ understood it was necessary for a health care provider to monitor a patient who had just been given ketamine, and during that observation period, have access to certain lifesaving equipment, including a defibrillator, a supply of supplemental oxygen, equipment to monitor the patient's heart rate and breathing, and medication to ensure patient safety, including medication to control unsafe spikes in blood pressure.

3.    Defendant CHAVEZ was aware that selling vials of ketamine to a patient for self-administration was illegal, far outside the scope of professional practice, and without a legitimate medical purpose.  Defendant CHAVEZ similarly knew it was illegal to obtain a prescription of a controlled substance in the name of a patient without the patient's knowledge or consent.

4.    On or about July 17, 2023, defendant CHAVEZ submitted a fraudulent prescription to Pharmacy 1 to obtain thirty 200mg ketamine lozenges in the name of Patient V.B. without Patient V.B.'s knowledge or consent.  Pharmacy 1 subsequently filled the fraudulent prescription and sent defendant CHAVEZ ten 200mg ketamine lozenges in V.B.'s name (the "Fraudulent V.B. Prescription").

B.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown but no later than September 2023, and continuing until at least on or about October 28, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHAVEZ conspired with others known and unknown to the United States Attorney, to knowingly and intentionally distribute ketamine, a Schedule III controlled substance, while acting and intending to act outside of the usual course of

professional practice, and without a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i).

C.   MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Co-Conspirator 1 would contact defendant CHAVEZ about purchasing ketamine from defendant CHAVEZ so that Co-Conspirator 1 could sell the ketamine to Victim M.P.

2.   Defendant CHAVEZ would communicate with Co-Conspirator 1 about the type and quantity of ketamine that defendant CHAVEZ had available for sale, and about the price in which Co-Conspirator 1 intended to charge Victim M.P. for ketamine.

3.   To ensure that defendant CHAVEZ and Co-Conspirator 1 had a sufficient supply of ketamine to sell to Victim M.P., defendant CHAVEZ would order ketamine from medical distributors and, in doing so, submit false certifications stating, among other things, that defendant CHAVEZ would not be selling or transferring the ketamine to another doctor.

4.   Defendant CHAVEZ would advise Co-Conspirator 1 how to administer ketamine to Victim M.P. and urge him to sell ketamine to Victim M.P. for profit, including selling the Fraudulent V.B. Prescription.

5.   Co-Conspirator 1 would administer ketamine to Victim M.P. via intermuscular injections and sell vials of ketamine which he would provide to Victim M.P. for self-administration by another co-conspirator.

3

6.    Co-Conspirator 1 would communicate with defendant CHAVEZ about his interactions with Victim M.P., including adverse reactions that Victim M.P. experienced when Co-Conspirator 1 administered a large dose of ketamine.

D.    OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant CHAVEZ and others known and unknown to the United States Attorney, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    On September 30, 2023, Co-Conspirator 1 contacted defendant CHAVEZ about purchasing ketamine from defendant CHAVEZ so that Co-Conspirator 1 could sell the ketamine to Victim M.P.

Overt Act No. 2:    On September 30, 2023, defendant CHAVEZ agreed to sell ketamine to Co-Conspirator 1.

Overt Act No. 3:    On September 30, 2023, in text messages, defendant CHAVEZ also told Co-Conspirator 1 that he had ketamine lozenges available and sent Co-Conspirator 1 a photograph of the Fraudulent V.B. Prescription with Patient V.B.'s name concealed by black marker.

Overt Act No. 4:    On September 30, 2023, in response to Co-Conspirator 1 asking "If I can get you 2k would you meet me halfway?", defendant CHAVEZ stated, "yes."

Overt Act No. 5:    On September 30, 2023, defendant CHAVEZ met Co-Conspirator 1 in or around Costa Mesa, California and transferred the following to Co-Conspirator 1: at least four vials of liquid

4

ketamine, nine ketamine lozenges from the Fraudulent V.B. Prescription, gloves, and syringes.

Overt Act No. 6:    On September 30, 2023, Co-Conspirator 1 traveled to Victim M.P.' residence in Los Angeles County, where he injected Victim M.P. with ketamine, and left behind at least one vial of ketamine and multiple syringes.

Overt Act No. 7:    On September 30, 2023, Co-Conspirator 1 sent text messages to defendant CHAVEZ describing the meeting with Victim M.P., stating it was "like a bad movie."

Overt Act No. 8:    On or about September 30, 2023, Co-Conspirator 1 paid defendant CHAVEZ a portion of the money Co-Conspirator 1 had received from selling ketamine to Victim M.P.

Overt Act No. 9:    On October 2, 2023, ahead of a planned meeting with Victim M.P. and in response to Co-Conspirator 1 stating, "[i]f today goes well we may have repeat business," defendant CHAVEZ sent a text message stating: "Let's do everything we can to make it happen."

Overt Act No. 10:    On October 2, 2023, defendant CHAVEZ told Co-Conspirator 1: "[y]ou should sell him the troches," referring to the ketamine obtained via the Fraudulent V.B. Prescription.

Overt Act No. 11:    On October 2, 2023, Co-Conspirator 1 traveled to Victim M.P.'s residence to inject him with ketamine and to sell additional ketamine, including the Fraudulent V.B. Prescription.

Overt Act No. 12:    On October 2, 2023, Co-Conspirator 1 provided updates to defendant CHAVEZ over text message regarding his visit to Victim M.P.'s residence, advising that he planned to give Victim M.P. 360 milligrams of ketamine over the span of an hour.

Overt Act No. 13:   On October 2, 2023, Co-Conspirator 1 informed defendant CHAVEZ that he would need additional ketamine to sell to Victim M.P.

Overt Act No. 14:   On October 2, 2023, defendant CHAVEZ attempted to place an order for 10 vials of ketamine from a wholesale distributor of controlled substances ("Wholesale Ketamine Distributor 1") for the purpose of obtaining additional ketamine to transfer to Co-Conspirator 1.

Overt Act No. 15:   On October 2, 2023, defendant CHAVEZ submitted a License Authorization Form to a different wholesale distributor of controlled substances ("Wholesale Ketamine Distributor 2") for the purpose of obtaining additional ketamine to transfer to Co-Conspirator 1.  Among other things, the License Authorization Form contained false statements, including that defendant CHAVEZ worked for the facility "Dreamscape Ketamine – The Health MD" and a certification that the drugs "will be used only by the organization" and "will not be sold to a third party, distributed or used for any other purpose."

Overt Act No. 16:   On October 4, 2023, in or around Irvine, California, defendant CHAVEZ transferred eight vials of liquid ketamine to Co-Conspirator 1, for which defendant CHAVEZ was later compensated.

Overt Act No. 17:   On October 4, 2023, Co-Conspirator 1 traveled to Victim M.P.'s residence to transfer and sell multiple vials of ketamine.

Overt Act No. 18:   On October 4, 2023, in text messages, Co-Conspirator 1 told defendant CHAVEZ the following: "any trouble finding more ketamine . . .  in case this continues with this guy,

and I think it would be best served not having him look elsewhere and [b]e his go to."

Overt Act No. 19:    On October 4, 2023, in response to the text messages described in Overt Act No. 18, defendant CHAVEZ stated he was "working on getting more" ketamine.

Overt Act No. 20:    On October 4, 2023, defendant CHAVEZ submitted an order for 10 vials of ketamine to Wholesale Ketamine Distributor 2, which he intended to distribute to Co-Conspirator 1 to be sold to Victim M.P.

Overt Act No. 21:    On October 4, 2023, in response to an email from Wholesale Ketamine Distributor 1 requesting that defendant CHAVEZ complete a "Know Your Customer" DEA Questionnaire, defendant CHAVEZ completed the form and submitted it to Wholesale Ketamine Distributor 1 knowing that it contained materially false statements, including stating "No" in response to the question, "Do you sell any products to other []practitioners?"

Overt Act No. 22:    On October 6, 2023, defendant CHAVEZ advised Co-Conspirator 1 over text message that he had "found a pharmacy that has Ketamine," and that the co-conspirators could obtain ketamine sooner than expected.

Overt Act No. 23:    On October 9, 2023, defendant CHAVEZ received the ketamine shipment from Wholesale Ketamine Distributor 1 and sent a text message to Co-Conspirator 1 advising, "Are we still meeting tomorrow.  We got the Shipment today.  One box of 10 vials."

Overt Act No. 24:    On October 9, 2023, in response to the text message referenced in Overt Act No. 23, Co-Conspirator 1 stated: "Great. Yes. I'm going to probably come to you[] mid day."

Overt Act No. 25:   On October 10, 2023, defendant CHAVEZ met Co-Conspirator 1 in Irvine, California and transferred 10 vials of ketamine to Co-Conspirator 1 so that they could be sold to Victim M.P.

Overt Act No. 26:   On October 10, 2023, Co-Conspirator 1 called defendant CHAVEZ and informed him that Co-Conspirator 1 had just injected Victim M.P. with ketamine while Victim M.P. was in the back seat of a vehicle parked in a public parking lot in Long Beach, California.

Overt Act No. 27:   On October 12, 2023, Co-Conspirator 1 administered a large dose of ketamine to Victim M.P. which caused an adverse medical reaction, including a significant spike to Victim M.P.'s systolic blood pressure and causing him to freeze up, such that Victim M.P. could not speak or move.

Overt Act No. 28:   October 13, 2023, in response to a text messages from Co-Conspirator 1 asking if he would be interested in running a ketamine clinic with Co-Conspirator 1, defendant CHAVEZ said: "interesting," and "as long as we are doing things on the up and up we can start ASAP . . . . All done legally without any shady stuff.  Having them come to the clinic will insure this."

Overt Act No. 29:   On October 13, 2023, in response to Co-Conspirator PLASENCIA's question, "Oh so you dont agree with the method I am currently doing?", defendant CHAVEZ stated: "It's not what I think it's what an entity like the California medical board would view it . . . . Or the DEA . . . " and forwarded Co-Conspirator PLASENCIA a screenshot of an October 12, 2023 email that defendant CHAVEZ received notifying him that he was under investigation by the California Board of Medicine.

1    Overt Act No. 30:    On October 19, 2023, when he was interviewed

2    by investigators from the DEA and the Medical Board of California

3    about the ketamine lozenges prescribed in Patient V.B.'s name missing

4    from defendant CHAVEZ's former ketamine clinic, defendant CHAVEZ

5    concealed from investigators the fact that he had transferred

6    ketamine to Co-Conspirator 1 to sell to Victim M.P. and instead

7    claimed that he had thrown the lozenges away because they had melted

8    in his car.

9    Overt Act No. 31:    On or after October 28, 2023, after learning

10   about Victim M.P.'s death, defendant CHAVEZ called Co-Conspirator 1

11   to discuss whether Co-Conspirator 1 was concerned that the ketamine

12   they distributed to Victim M.P. may have been the cause of his death.

13

14                            E. MARTIN ESTRADA
                             United States Attorney
15

16

17                           MACK E. JENKINS
                             Assistant United States Attorney
18                           Chief, Criminal Division

19                           IAN V. YANNIELLO
                             Assistant United States Attorney
20                           Chief, General Crimes Section

21                           HAOXIAOHAN CAI
                             Assistant United States Attorney
22                           Major Frauds Section

23

24

25

26

27

28

                                    9

**CERTIFICATE OF SERVICE**

I, **Abigail M. Haun**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**PLEA AGREEMENT FOR MARK CHAVEZ.**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☒ Via email, as follows:

☐ By Federal Express, as follows:

**MARK CHAVEZ**
**c/o Matthew Binninger**
**matt@binningerlaw.com**

This Certificate is executed on **August 14, 2024**, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

*Abigail M. Haun*
Abigail M. Haun
Legal Assistant