TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
1500/1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone:     (213) 894-3667/0762
Facsimile:     (213) 894-0141
E-mail:   Ian.Yanniello@usdoj.gov
          Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-492-SPG |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT MARK CHAVEZ |
| v. | |
| MARK CHAVEZ, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Deputy Attorney General, the First Assistant United States Attorney for the Central District of California, and Assistant United States Attorneys Haoxiaohan Cai and Ian V. Yanniello, hereby files its Sentencing Position Regarding Defendant MARK CHAVEZ.

//

//

This position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 19, 2025        Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

          /s/
IAN V. YANNIELLO
HAOXIAOHAN CAI
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant Mark Chavez, the former operator of a ketamine clinic who was intimately familiar with the strict protocols required to safely administer ketamine to patients, repeatedly sold ketamine that he knew would be given to a patient with a history of substance abuse.  Defendant did this by selling fraudulently obtained vials of ketamine, as well as fraudulently obtained ketamine lozenges, to his co-conspirator Salvador Plasencia, knowing that Plasencia would be selling the ketamine to the patient for unmonitored and unsafe self-administration.

As the Drug Enforcement Administration and Medical Board investigators closed in on defendant's illegal ketamine sales, defendant initially lied and tried to evade responsibility.  To defendant's credit, however, his story continued, and became one of accountability.  As further detailed below, when confronted with his criminal activity, defendant expediently accepted responsibility and agreed to cooperate with the government's investigation.

For the reasons set forth below, the government moves for a two-level downward departure based on defendant's cooperation, resulting in a total offense level of 4 and a Guidelines range of 0-6 months.  The government respectfully submits that a sentence of six months home confinement that includes a two-year term of supervised release and an order to complete at least 300 hours of community service, is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

## II. DEFENDANT'S PLEA AGREEMENT AND RELEVANT FACTUAL BACKGROUND

### A. The Plea Agreement

Pursuant to a plea agreement, defendant pled guilty to one count of conspiracy to distribute ketamine. (See Dkts. 3 [Plea Agreement]; 22 [Minutes of Change of Plea].) Defendant also agreed to cooperate fully with the government's ongoing investigation. (Dkt. 3 at 3.)

### B. Defendant Knew About the Risks of Administering Ketamine Without Medical Supervision

At all relevant times, defendant and Co-Conspirator Plasencia were medical doctors, who had obtained authorization from the Drug Enforcement Administration (DEA) to dispense, administer and prescribe narcotics, so long as they were for a legitimate medical purpose. (Dkt. 3 at 9.)

Defendant knew that ketamine was a Schedule III controlled substance that was FDA-approved for general anesthesia during surgical procedures. (Id.) He understood that ketamine should be administered only under close supervision of a medical doctor and/or professional health care provider because of the risks associated with ketamine. (Id. at 10.) Defendant understood that patients who were just given ketamine injections must be closely monitored by a health care professional who has access to life-saving equipment, including a defibrillator, supplemental oxygen, and medication to control unsafe spikes in blood pressure. (Id.)

Defendant was further aware that selling vials of ketamine to a patient for self-administration was illegal, far outside of the scope of professional practice, and without a legitimate medical purpose. (Id.) Defendant also knew it was illegal to get a prescription of a

4

controlled substance, like ketamine, in the name of a patient without that patient's knowledge or consent. (Id.)

### C. Defendant Conspired to Distribute Ketamine to Matthew Perry

On September 30, 2023, defendant entered into a conspiracy with Plasencia to illegally distribute ketamine to Matthew Perry, in a manner outside the scope of medical practice and without a legitimate medical purpose. (Id. at 11.) After Plasencia informed defendant that a famous patient offered to pay a premium to get vials of ketamine, defendant agreed to source the ketamine that Plasencia would later resell to Mr. Perry. Defendant agreed to sell both vials of liquid ketamine and ketamine lozenges, which defendant admitted he obtained through fraud by submitting a fraudulent prescription in the name of a patient without the patient's knowledge or consent (the "Fraudulent V.B. Prescription"). (Id. at 11-12.)

That same day, Plasencia obtained the ketamine from defendant and then traveled to Mr. Perry's residence and injected him with liquid ketamine, and left behind at least one vial of ketamine for self-administration. (Id.) Plasencia later told defendant that his meeting with Mr. Perry was "like a bad movie." (Id.)

On October 2, 2023, Plasencia and defendant discussed continuing to sell ketamine to Mr. Perry. Plasencia, for example, told defendant, "[i]f today goes well we may have repeat business," and defendant responded: "Let's do everything we can to make that happen." (Id. at 13.) To make sure Plasencia had a steady stream of ketamine to sell to Perry, defendant contacted two medical distributors to buy more ketamine. For one of the distributors, defendant submitted a false License Authorization Form to enable him to buy the ketamine, in which he falsely certified --- under penalty

5

of perjury --- that: (1) he worked for his former facility, Dreamscape Ketamine – the Health MD," and (2) the ketamine would be used by Dreamscape and "not be sold to a third party, distributed or used for any other purpose." (Id.) At the time, defendant knew that he had separated from Dreamscape Ketamine as of July 2023 and that the ketamine he was purchasing was for Plasencia to resell to Mr. Perry. (Id.)

That same day, Plasencia updated defendant on his meeting with Mr. Perry and told defendant that he had injected Mr. Perry with 360 milligrams of ketamine within an hour. (Id.) Defendant understood this could potentially be a dangerous amount of ketamine depending on the patient's underlying health conditions. (Id.) Nonetheless on October 4, 2023, defendant met with Plasencia to sell him an additional 8 vials of ketamine that defendant knew would be sold to Mr. Perry. (Id. at 14.)

During the conspiracy, the co-conspirators continued to discuss sourcing enough ketamine to sell to Mr. Perry. On October 4, 2023, for example, Plasencia asked defendant: "any trouble finding more ketamine ... in case this continues with this guy," and stated, "I think it would be best served not having him look elsewhere and [b]e his go to." (Id.) Defendant confirmed he was "working on getting more" ketamine, and later that day, contacted the wholesale ketamine distributors again. (Id.) Defendant submitted an order for 10 vials of ketamine to one distributor, and submitted required paperwork to try to buy from the other distributor, specifically, a "Know Your Customer" DEA Questionnaire. (Id.) Defendant submitted a signed form that contained materially false statements, declaring under penalty of perjury that "Patients are vetted very carefully.

6

Prescr[i]ptions for controlled substances are only prescribed after determining there is genuine need," and answered "No" to the question, "Do you sell any products to other [] practitioners?" (Id.)  After receiving this form, the distributor processed defendant's order for 10 vials of ketamine for $121.41.  Thereafter, defendant contacted Plasencia that he got the shipment of ketamine he was expecting from the pharmacy.  (Id.)

Defendant understood on or before October 9, 2023 that Plasencia was providing Mr. Perry with ketamine in a medically unsafe manner, by leaving ketamine vials with Mr. Perry and Mr. Perry's personal assistant for self-administration.  Defendant also understood from Plasencia that Mr. Perry had health issues that could increase the risk of taking ketamine outside of a clinical setting without medical observation.  (Id. at 15.)  Nonetheless, on October 10, 2023, defendant met up with Plasencia to sell Plasencia more vials of ketamine to sell to Mr. Perry.  That same day, defendant learned that Plasencia had injected Mr. Perry with ketamine while Mr. Perry was in the back seat of a car parked at a public parking lot of an aquarium in Long Beach, California.  (Id.)  Defendant reprimanded Plasencia for "dosing people" in cars in a public place where children were present. (Id.)

On October 12, 2023, Plasencia advised defendant that at a meeting where Plasencia injected Mr. Perry with a large dose of ketamine at Mr. Perry's residence, Mr. Perry had a serious adverse reaction --- specifically, a significant spike in Mr. Perry's blood pressure. (Id. at 16.)

That same day, defendant learned that the Medical Board of California was investigating an allegation that he had improperly

7

taken ketamine from his former clinic. (Id. at 17.) After learning this, defendant told Plasencia that he would no longer be able to sell ketamine to Plasencia. (Id.)

In total, defendant transferred at least 22 vials of ketamine and 9 ketamine lozenges to Plasencia, all of which he understood would be used by Mr. Perry. (Id.)

### D. Defendant Took Steps to Conceal the Transfer of Ketamine to Plasencia

After defendant separated from his former ketamine clinic, defendant retrieved all prescription drugs --- including ketamine --- from the clinic, including the Fraudulent V.B. prescription. (Id. at 18.) On September 13, 2023, defendant lawfully transferred some of the ketamine from his former clinic to a medical facility in San Diego (the "Medical Facility"). (Id.) Defendant, however, kept possession of at least the following: (1) the lozenges prescribed to V.B. from the Fraudulent V.B. prescription, and (2) at least 12 vials of ketamine that defendant subsequently transferred to Plasencia in September and October 2023. (Id.)

On October 19, 2023, DEA diversion investigators and an investigator with the Medical Board of California interviewed defendant. (Id. at 19.) Defendant was asked if he still had the ketamine taken from his former clinic. (Id.) Defendant responded no, and claimed he had transferred the liquid ketamine to the Medical Facility. (Id.) When asked about the ketamine lozenges prescribed to Patient V.B., defendant admitted he prescribed the lozenges without V.B.'s consent but claimed he had thrown the prescription away because the lozenges melted inside of his vehicle. (Id.) During the interview, defendant concealed that he had in fact

8

transferred ketamine to Plasencia, including the Fraudulent V.B. Prescription, and also concealed material evidence from investigators, including texts and "Bill of Sale" documents showing ketamine transfers to Plasencia. (Id.)

### III. SENTENCING GUIDELINES CALCULATION

The government agrees with the PSR's guidelines calculation, with the modification that it believes that a two-level safety valve reduction should apply. However, as described below, this still leads to the same Guidelines range set forth in the PSR, that is, 0-6 months.

Specifically, the government agrees with the PSR's determination that the base offense level is 6, based on the quantity of ketamine defendant distributed. (PSR ¶ 49.)

The government also agrees with the PSR's application of a two-level increase based on defendant's abuse of trust, given his profession as a doctor in disregarding Mr. Perry's welfare, and using his medical credentials to additionally buy ketamine from other suppliers (PSR ¶ 57), and an additional two-level enhancement for defendant's obstruction of justice for lying to the DEA and California Medical Board investigators (PSR ¶ 59).

Based on a two-level reduction for acceptance of responsibility (PSR ¶ 62) and the two-level safety valve reduction under Section 5C1.2, the government submits the resulting total offense level is 6. Based on a total offense level of 6 and defendant's Criminal History Category of I (PSR ¶ 72), the resulting Guidelines range is 0-6 months imprisonment, which is within Zone A of the Guidelines table.

## IV. MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE

Based on defendant's cooperation and substantial assistance provided to the government, the government seeks a two-level downward departure under U.S.S.G. § 5K1.1.

U.S.S.G. § 5K1.1 enumerates several factors that the Court should consider when determining whether a departure for "substantial assistance to authorities" is appropriate, including: (1) the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness, and reliability of the information provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) the danger or risk of injury to the defendant or his family resulting from his assistance; and (5) the timeliness of his assistance.

In this case, after defendant was confronted with evidence showing his criminal conduct, defendant expediently accepted responsibility and agreed to assist law enforcement with its ongoing investigation into more culpable offenders. During multiple proffer sessions, defendant provided information about his own criminal conduct, as well as the criminal conduct of Plasencia. Defendant explained Plasencia's role, as well as details about conversations defendant had with Plasencia where Plasencia made clear his intent to illegally distribute ketamine to a patient with a history of drug abuse, including Plasencia's recognition that Mr. Perry's health had been "spiraling out of control."[1] Defendant made frank admissions

---

[1] In contrast, Plasencia has consistently denied, even through his sentencing position, that he was aware of Mr. Perry's struggles with addiction. (See United States v. Salvador Plasencia, 24-CR-236(A)-SPG-2, Dkt. 97 (PLASENCIA's sentencing position), at 2 (claiming he lacked a "full understanding of his patient's
*(footnote cont'd on next page)*

about his knowledge of Plasencia's unethical and dangerous ketamine transfers to Mr. Perry.

Based on the nature and timeliness of defendant's assistance, the government moves for a two-level departure, which results in a total offense level of 4 and an advisory Guidelines range of 0 to 6 months.

**V.   A SIX MONTH SENTENCE OF HOME DETENTION IS JUST AND APPROPRIATE**

But for defendant's early and expedient acceptance of responsibility and agreement to cooperate in the government's investigation, the government would be seeking an above-Guidelines sentence of imprisonment.  However, for the reasons set forth below, the government submits that a sentence of 6 months home confinement is just and appropriate to adequate to account for defendant's crimes and satisfy the sentencing goals of 18 U.S.C. § 3553(a).  The government also recommends a supervised release term of 2 years, during which he should be required to complete at least 300 hours of community service.

**A.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

Defendant's crime is undoubtably serious.  He was a medical doctor who used his position of trust to fraudulently obtain ketamine --- be it lozenges or vials procured under false pretenses from wholesale distributors --- so he could sell it to Plasencia for profit.  Defendant did so knowing that Plasencia would be transferring the ketamine to a vulnerable patient with a history of

---

addiction") and 22 (claiming that Plasencia ignored clear signs of Mr. Perry's addiction).  Defendant would have testified that he knew about Mr. Perry's conditions through discussions with Plasencia and because he was aware of Mr. Perry's struggles because of familiarity with Mr. Perry's book.

11

addiction. He did this all for money. In mitigation, defendant accepted responsibility for his crimes, and did not downplay the severity of his conduct. In addition to pleading guilty and agreeing to waive indictment, he also relinquished his medical license in November 2024, at an early stage in the proceedings. (PSR ¶ 92.) But for a dated property damage conviction, defendant has limited criminal history, and appears to have served the community as a physician without incident until the instance offense. (PSR ¶¶ 71, 89-97). In light of the above, as well as defendant's substantial assistance to the government, the government submits that a 6-month sentence of home confinement is appropriate.

### B. Seriousness of the Offense, Promote Respect for the Law, Need for Deterrence and Protection of the Public

A sentence of 6 months home confinement is also sufficient to vindicate the goals of deterrence, respect for the law, and protection of the public. Defendant's conviction in this case has foreclosed his primary livelihood of being a doctor --- as it should be, given defendant's flagrant derelictions of his duties. Defendant has adjusted by seeking employment as a driver. (PSR ¶ 105.) A sentence of home confinement would further sanction defendant and require him to reflect how his callous profit-seeking violated the trust of patients and cost him not only his license, but his liberty. Such a sentence would further allow defendant to work to make amends for his criminal conduct by serving the community through court-ordered community service.

### C. The Sentence Avoids Unwarranted Disparities

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants. Using the

12

Sentencing Guidelines to sentence the defendant to a high-end sentence of home confinement accomplishes this goal.  Similarly-situated defendants with the same criminal history who provided the same level of assistance would likely receive a sentence within the same range.

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 6 months' home imprisonment; (ii) order defendant to serve at least 300 hours of community service; (iii) a two-year term of supervised release; and (iv) a mandatory special assessment of $100.